**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

EDWIN R. HAIRSTON                                                                                           PLAINTIFF

v.                                              No. 4:05CV01142 JLH

LOCTITE CORPORATION and
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY                                                                                  DEFENDANTS

**OPINION AND ORDER**

Edwin R. Hairston brought this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, against his employer Loctite Corporation and Hartford Life and Accident Insurance Company in its capacity as insurer of the group long-term disability plan provided by Loctite. Hairston worked as a district sales manager at Loctite and participated in the company's group long-term disability plan. In October of 1988, CIGNA, the insurer of Loctite's long-term disability plan, found that Hairston was totally disabled and began paying disability benefits. Hairston had been receiving those benefits for eight years when Hartford became the insurer for Loctite's plan. Hartford informed Hairston that this change would not alter his benefits in any way. After paying benefits to Hairston for another eight years, Hartford found that Hairston was no longer disabled and terminated Hairston's benefits in December 2003. On appeal, Hartford affirmed that decision. Hairston then commenced this action alleging that the defendants improperly terminated his disability benefits. Hairston has filed a motion for summary judgment (Docket #8) and a motion for consideration for additional documents (Docket #6). In response, the defendants have filed a cross motion for summary judgment (Docket #21). For all the reasons set forth below,

Hairston's motion for summary judgment is granted, while defendants' cross motion for summary judgment is denied. Hairston's motion for consideration for additional documents is denied as moot.

**I.**

Hairston worked as a district sales manager for Loctite for approximately two years. In January 1986, Hairston suffered his first heart attack and was diagnosed with heart disease at age 46. In February 1987, Hairston suffered another heart attack and underwent emergency double-bypass surgery. Hairston returned to work after his surgery, but began experiencing serious chest discomfort in August 1987. After suffering a minor heart attack in September 1987, Hairston left work. In July 1988, Hairston applied for long-term disability benefits from his employer Loctite.

Hairston submitted an attending physician's statement from his cardiologist Dr. Randal Hundley in support of his claim for benefits. Dr. Hundley listed Hairston's diagnosis as congestive heart failure, accelerated atherosclerosis, and hyperlipidemia. Under the heading "objective findings," Dr. Hundley noted that Hairston's left ventricular ejection fraction was 33%. Dr. Hundley listed Hairston's cardiac functional capacity as class II, "slight limitation," and Hairston's physical impairment as class four, "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." For limitations, Dr. Hundley listed walking, climbing, stooping, bending, and lifting. He also wrote that Hairston needed "to avoid any activity which puts extra demand on the heart muscle and results in fatigue." Dr. Hundley rated Hairston's mental and nervous impairment as class one and explained, "[p]atient is able to function under stress and engage in interpersonal relations (no limitations)." Under the heading "extent of disability," Dr. Hundley stated that Hairston was now totally disabled from any occupation and would never be able to resume any work. Hairston also filled out a disability questionnaire for CIGNA. In response to the

question that asked what prevented Hairston from engaging in any gainful employment, Hairston responded: "get tired very easy, must rest very often, take nap in afternoon." Hairston also listed fishing as one of his hobbies.

In a letter dated October 14, 1988, CIGNA approved Hairston's application for long-term disability benefits based on Hairston's "inability to perform the essential duties of any occupation." CIGNA notified Hairston in the October 14 letter that it would continue to request updated medical information. Hairston submitted attending physician's statements and physical capacities reports as well as personal questionnaires and medical records.

The attending physician's statements and physical capacities reports showed little change in Hairston's condition from 1988 to 1995. In the April 1991 attending physician's statement, Dr. Ed Hill, Hairston's internal medicine physician, marked the form to show that Hairston's progress was "unchanged." Dr. Hill wrote that Hairston's present condition was organic heart disease with coronary artery disease and compensated congestive heart failure. Dr. Hill described Hairston's cardiac impairment as a class two to three, slight to marked limitation; his physical impairment as a class three, slight limitation; and his mental and nervous impairment as a class three, moderate limitation. Dr. Hill wrote that Hairston's activity was limited to the point when he becomes breathless. He marked the form to show climbing and lifting limitations. Similarly, Dr. Hill wrote on the January 1992 attending physician statement that "patient remains disabled as previously noted in 1987." Dr. Hill marked the form to show that Hairston's progress was "unchanged" and that his cardiac impairment was between classes two and three. While Dr. Hill listed Hairston's mental and nervous impairment as a class one, no limitation, Dr. Hill listed Hairston's physical impairment as a class four, moderate limitation. Dr. Hill also checked the lines for walking, stooping, and use of

3

hands as additional physical limitations. Dr. Hill's January 1993 attending physician statement mirrored the 1992 statement, with the exception that Dr. Hill had not checked any of the additional physical limitations listed on the statement. On the 1994 statement, Dr. Hill again marked the form to show that Hairston's progress was unchanged while listing Hairston's cardiac capacity as a class two, slight limitation. Dr. Hill indicated that Hairston was restricted to one to two hours sitting, one to two hours standing, one to two hours walking, occasionally lifting up to twenty pounds but never more, never climbing, and occasionally twisting or bending.

In 1993, Dr. Hill filled out a physical capacity report. On that report, Dr. Hill wrote that he would "probably never" release Hairston to full-time work activity. Dr. Hill wrote that Hairston could sit three to four hours a day; stand, walk, bend over, twist, climb, reach above shoulder level, crouch or stoop, and balance one to two hours per day; and never climb, kneel, or push or pull. Hairston could repetitively use his feet for one to two hours per day; repetitively use his right hand for three to four hours and left hand one to two hours a day; grasp lightly for three to four hours a day; grasp strongly in the right hand for one to two hours a day, though never with both hands; use fine finger dexterity for one to two hours per day in both hands; and maintain his head and neck in the static position, twist, look up, and look down for one to two hours per day. Hairston could occasionally lift up to 25 pounds only 1-33% of the time and never anything heavier. He was never capable of engaging in any kind of stressful situation and only occasionally could engage in any kind of decision making. Hairston was not capable of walking on uneven ground; being around moving equipment and machinery; and operating any trucks, forklifts, or other equipment. Dr. Hill wrote that these restrictions limited Hairston to working only one to two hours a day. On a separate report of physical capacity completed in 1994, Dr. Hill indicated restrictions substantially identical to those

listed in the 1993 physical capacity report. Dr. Hill again noted that those restrictions limited Hairston to working one to two hours a day.

Hairston's personal questionnaires also showed little change in Hairston's condition from 1988 to 1995. In a questionnaire dated August 13, 1993, Hairston described his physical complaints as chest pains and shortness of breath. Hairston also indicated that his hobbies included fishing and camping in an RV. Hairston stated that he helped his wife do housework occasionally by doing minor household repairs, vacuuming, and dusting. On his 1994 questionnaire, Hairston wrote "condition unchanged from previous[:] chest pain [and] shortness of breath—overcome by resting." Hairston again listed fishing as a hobby that he engaged in on a monthly basis. Hairston stated that his daily activities included light walking and light work around the house with periods of rest.

In July 1995, Hartford became the insurer for Loctite's long-term disability plan. Hartford sent Hairston a letter dated June 22, 1995, explaining that it was now responsible for the administration of Loctite's plan. In that letter, Hartford stated: "**Please be assured that this is a change in administrative responsibilities only. Your benefits will not be altered in any way.**" (Bold in original). The record contains the group benefit plan and plan booklet Hartford issued to Loctite. Under the terms of the plan, Loctite was both the policyholder and plan administrator. The plan provided benefits for any employee who is totally disabled and contained two definitions of *totally disabled*. For the elimination period and the first 24 months thereafter, *totally disabled* means that the insured is prevented by accidental bodily injury, sickness, mental illness, substance abuse, or pregnancy "from doing all the material and substantial duties of [his] own occupation." Following the elimination period and the 24 months following, *totally disabled* means that the insured "must be so prevented from performing the essential duties of any occupation for which [he is] qualified

by education, training or experience." The plan provides that benefit payments would cease on the first to occur of: "(1) the date you are no longer disabled; (2) the date you fail to furnish proof, when requested by us, that you continue to be Disabled . . . ." Under the provisions of the plan, Hartford had "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."

In a letter dated July 25, 1997, Hartford informed Hairston that he had to submit updated medical information every eighteen months. For the years 1996 to 2003, the record contains Dr. Hill's attending physician statements for 1996, 1997, 2000, and 2001; a 2000 physical capacities evaluation by Dr. Hill; physical exam results for 1996, 1997, 2000, 2001, and 2002; Hairston's personal questionnaires for 1997, 2000, 2001, and 2003; and Dr. Hill's office notes from 1998 to 2000.

In 1996, Dr. Hill continued to describe Hairston's progress as unchanged. Dr. Hill described Hairston's physical limitations in the 1996 attending physician's statement as a class two, medium manual activity. Where the statement asked Dr. Hill for a prognosis as to whether Hairston was totally disabled, Dr. Hill wrote "History and Physical Exam Attached." Dr. Hill noted on Hairston's 1996 physical exam that Hairston's organic heart disease was stable and that Hairston still suffered from occasional chest discomfort and breathlessness with exertion.

In 1997, everything Dr. Hill wrote on the attending physician's statement remained the same as the 1996 statement, though Dr. Hill did not fill out the progress section. Hairston's 1997 physical exam is also similar to the 1996 exam. Dr. Hill noted on the 1997 exam that Hairston did not have chest tightness other than when he over exerted himself. For Hairston's assessment, Dr. Hill wrote that Hairston had organic heart disease, atherosclerotic heart disease, and coronary artery disease

with functional classification II-B.[1]  Describing his own condition, Hairston stated on his personal questionnaire "heart condition is about the same as previously noted."  Hairston also stated that he needed to rest often and his mental status was good if he stayed out of stressful situations.  Regarding his hobbies, Hairston wrote that he enjoyed, among other things, fishing and woodworking "on [an] occasional basis for short periods as long as I rest pretty regular."

In 2000, Dr. Hill checked the "recovered" box for Hairston's progress on the 2000 attending physician's statement and indicated on the 2000 physical capacities evaluation that Hairston had reached the maximum medical improvement.  Dr. Hill wrote on the physical capacities evaluation that, even with the maximum medical improvement, Hairston could never return to his regular occupation either in a full or light duty capacity.  When asked on the physical capacities evaluation to "check the exact degree of work you feel this patient is capable of performing," Dr. Hill did not check sedentary work, light work, medium work, heavy work, or very heavy work; instead, Dr. Hill wrote "none."  Regarding Hairston's physical limitations, Dr. Hill noted that Hairston could sit for two hours, stand for one hour with intermittent rest, walk a half hour with rest, and drive a car two hours with rest.  Dr. Hill wrote that Hairston could lift up to 20 pounds occasionally but not more; could never climb, balance, or crawl; and could occasionally stoop, kneel, crouch, and reach.  Dr. Hill stated on Hairston's 2000 physical exam that while Hairston's angina had not gotten any worse,

---

[1]Functional classification II-B has two parts.  The "II" refers to a class II level of cardiac functional capacity, which the American Heart Association has described in the following way: "Patients with cardiac disease resulting in slight limitation of physical activity.  They are comfortable at rest.  Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain."  American Heart Ass'n, 1994 Revisions to Classification of Functional Capacity and Objective Assessment of Patients With Diseases of the Heart (last visited Feb. 8, 2006), http://www.americanheart.org/presenter.jhtml?identifier=1712.  The "B" refers objective assessment B, meaning "objective evidence [exists] of minimal cardiovascular disease."  *Id*.

Hairston did have to limit his activities due to angina and shortness of breath. Dr. Hill again wrote on Hairston's physical exam that Hairston had organic heart disease, atherosclerotic heart disease, and coronary artery disease with functional classification II-B. Dr. Hill also noted that Hairston had another heart attack in December 1998 requiring stent placement to a bypass graft to the right coronary artery in 1999. Dr. Hill wrote in an office note dated March 22, 2000, that Hairston "had retrogressed secondary to the fact that he has had another [myocardial infarction]." Regarding his own condition, Hairston stated on the 2000 personal questionnaire that he could do most of his daily activities if they were accompanied by frequent rest periods. Hairston listed "light woodworking" and "short walks" as two of his daily activities.

In 2001, Dr. Hill wrote "no changes" on the impairment section of the attending physician's statement and continued to check "recovered" for Hairston's progress. Dr. Hill also noted a left ventricular ejection fraction of 38% on the 2001 statement. On Hairston's physical exam, Dr. Hill wrote that Hairston "has to limit his activity in order to avert chest pain but he has been able to accomplish his usual activities without any major difficulty." Dr. Hill did not change Hairston's assessment on his physical exam; he again wrote that Hairston had organic heart disease, atherosclerotic heart disease, and coronary artery disease with functional classification II-B. On his 2001 personal questionnaire, Hairston wrote that his condition had changed in the last 18 months in that his rest periods became longer. Hairston also wrote that he still did some fishing after he became disabled.

In 2002, Dr. Hill noted on Hairston's physical exam that while Hairston was "having no major problems," Hairston "does have exertional angina but he limits his exertion." Dr. Hill did not change Hairston's assessment on his physical exam; he again wrote that Hairston had organic

8

heart disease, atherosclerotic heart disease, and coronary artery disease with functional classification II-B. Hairston described his condition on a February 24, 2003, personal questionnaire as "heart problems—unable to do any work without frequent rest[;] exertion causes chest pains and shortness of breath." When asked whether his condition changed in the last 18 months, Hairston wrote that "fatigue comes faster." While Hairston stated that he still engaged in his favorite pre-disability activities of fishing, camping, woodworking, and walking, he stated that he could only do them now "in a very limited way . . . because of chest pains and shortness of breath—must rest often."

On February 2, 2003, Hartford claim specialist Steven L. Foster noted that Hairston's file had not undergone a "focus review." Although harboring doubts as to Hairston's "capacity for sustained work activity given his cardiac [history]," Foster requested a review by Janet Fricano, a registered nurse, of Hairston's file. In her report, Fricano wrote:

> File review supports that claimant sustained damage to the left side of his heart from two myocardial infarctions '86-'87. File review supports that claimant's organic heart disease has remained relatively stable with the exception of one catherization with stent placement in '98 and an ejection fraction of 38%. Dr. Hill continues to list claimant as a Class II in terms of cardiac function. Functionally this would place exertional limits on claimant in terms of lift, carry, push and pull usually in the area of 10-20 lbs. or less. Claimant commented on earlier questionnaires that he needed to avoid stress. Extraordinary stress does affect blood pressure, which in turn places an extra burden on an already compromised cardiovascular system. . . . Based on the multiple APS submitted by Dr. Hill (Internal Medicine) over the years there appears to [be] agreement with the exception of a "00 [sic] PCE where the AP documented no return to work. There is evidence of stability in regards to claimant's cardiac condition since date of disability (*2/28/88*). Claimant self-described his ability to complete activities of daily living, camp and fish as long as he does not physically over exert himself. It would be my nursing opinion that claimant has stabilized with the risk of early mortality before age 65 (2007) being small but present due to his long-standing history of tobacco use and positive treadmill findings in '91. In terms of sustained abilities it is difficult to determine by review of the file due to no other treadmill findings noted after '91 for review. This then becomes a matter of physician level determination due to claimant's cardiac functional Class II level.

9

After receiving Fricano's report, Foster requested a review of Hairston's medical records by a physician. Foster asked the physician to address Hairston's ability to sustain full-time employment. David Peters, a board certified family practice physician at the Medical Advisory Group LLC, performed the review of Hairston's medical records. Dr. Peters framed the issues as whether "the available objective evidence support[s] the claim that he is unable to return to work at any level" and whether Hairston "retain[ed] the functional capacity to return to work." After briefly outlining Hairston's medical history from 1986 to 2002, Dr. Peters wrote:

> DISCUSSION:
>
> Edward Hairston sustained an acute myocardial infarction in 1986. He had another myocardial infarction in 1987 and had a two-vessel coronary artery bypass graft in 1987. His postoperative left ventricular ejection fraction has been up to 38% and there have been no clinical signs of congestive heart failure reported for several years. There is no objective documentation that indicates that he cannot perform activities of daily living. He has not required diuretics and the only significant cardiac intervention since 1987 was a single vessel angioplasty in 1998. . . .
>
> CONCLUSION:
>
> 1.  It is my opinion that the objective information available does not support Mr. Hairston's claim that he cannot return to work at any level.
> 2.  Based on the objective information presented to me, it is my opinion that the claimant retains the capability to perform full-time sedentary work.

Dr. Peters stated that he spoke with Dr. Hill on November 7, 2003, and Dr. Hill told him that Hairston was "'probably' capable of full time sedentary work." Dr. Peters sent Dr. Hill a letter to confirm the contents of their November 7 conversation. In that letter, however, Dr. Peters did not mention full-time work, but instead wrote, "You agreed that [Hairston] is probably capable of performing sedentary work." Dr. Peters also stated in the letter that "[i]f I do not hear from you

within five business days . . . I will assume that I have accurately summarized our conversation." Dr. Hill did not respond within five business days.

After receiving the report of Dr. Peters, Foster ordered an employability analysis. Vocational expert Marvin Bryant performed the employability analysis under the assumption, based on Dr. Peters's recollection of his phone conversation with Dr. Hill, that Hairston was probably capable of full-time sedentary work. Taking that assumption and Hairston's previous training, work history, and education into account, Bryant listed four positions for which Hairston was qualified: telephone solicitor, surveillance system monitor, check cashier, and automobile locator.

On December 2, 2003, Hartford sent Hairston a letter informing him that it was terminating his disability benefits. The letter stated, "We have completed our review of your claim for continued benefits and have determined you no longer satisfy the definition of Total Disability as outlined in the policy." The letter listed the evidence Hartford had considered in deciding to terminate Hairston's benefits:

> We based our decision to deny your claim on policy language. All material contained in your file was viewed as a whole. This included medical records and treatment notes for the period 1/27/1986 through 6/2/2006 . . . . There was an independent medical record review documented by report dated 11/7/2003 by Medical Advisory Group (MAG) physician, Dr. Peters. Dr. Peters spoke with your primary care physician, Dr. Hill, on 11/7/2003 to discuss your ability to function and summarized his conversation by letter dated 11/9/2003. Additionally, a Vocational Expert performed an Employability Analysis on 11/19/2003.

Hartford informed Hairston that he had a right to appeal the decision within 180 days from December 2, 2003. Hairston appealed Hartford's decision.[2]  In a letter dated August 9, 2004,

---

[2]During the appeal, both sides produced additional evidence, including a January 12, 2004 letter by Dr. Hundley; a February 16, 2004, letter by Dr. Hundley; a July 26, 2004, medical review by Dr. Philip Podrid; and a July 26, 2004, letter from Dr. Podrid to Dr. Hundley. This evidence need not be discussed or considered, however, because it was produced after Hartford's

Hartford affirmed its decision to terminate Hairston's benefits. On October 5, 2004, Hartford reopened Hairston's file because it analyzed Hairston's appeal under the wrong policy. Hartford again reaffirmed its decision to terminate Hairston's benefits in a letter dated November 17, 2004. On August 22, 2005, Hairston brought this suit against Hartford and Loctite to recover disability benefits under the plan.

## II.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Norris v. Citibank, N.A. Disability Plan*, 308 F.3d 880, 883 (8th Cir. 2002). As an initial matter, defendants argue that Loctite should be dismissed from this suit because it is not a proper party. The administrator of an ERISA plan is a proper party in a suit to recover disability benefits. *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1194-95 (8th Cir. 1998); *Layes v. Mead*, 132 F.3d 1246, 1249 (8th Cir. 1998). ERISA defines "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i). Here, Loctite is referred to as the "plan administrator" on page 24 of the plan booklet. Loctite is therefore a proper party in this suit and will not be dismissed.

The parties disagree as to the proper standard of review that this Court should apply in reviewing Hartford's decision to terminate Hairston's benefits. Although ERISA states no standard

---

decision to discontinue benefits. *See Morgan v. Unum Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003).

12

of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the court will review for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). Under the abuse of discretion standard, a court reviews an administrator's decision to determine if it was supported by "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005). Assuming that the more lenient abuse of discretion standard of review applies in this case, Hartford abused its discretion when it terminated Hairston's benefits without substantial evidence that Hairston's condition had improved or any other significant new information about his claim.

The defendants cite several Eighth Circuit decisions that they believe are analogous to this case and mandate that Hartford's decision must be upheld. All of these cases, however, involve either an initial denial of benefits or a subsequent termination of benefits after the definition of disability changed. *See Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 796 (8th Cir. 2002) (denying claimant's initial application for benefits); *Fletcher-Merritt v. NorAm Energy Corp.*, 250 F.3d 1174, 1177 (8th Cir. 2001) (initial denial); *Bolling v. Eli Lilly & Co.*, 990 F.2d 1028, 1029 (8th Cir. 1993) (initial denial); *see also Jackson v. Metropolitan Life Ins. Co.*, 303 F.3d 884, 886-87 (8th Cir. 2002) (termination of benefits after definition of "disabled" changed from "unable to perform the material duties of [his] regular job" to "unable to perform each of the material duties of any gainful work or service for which [he is] reasonably qualified"); *Bremer v. Hartford Life & Accident Ins. Co.*, 16 F. Supp. 2d 1057, 1058-59 (D. Minn. 1997) (termination of benefits after definition of

"totally disabled" changed from "own occupation" to "any occupation"). In none of these cases did a plan administrator terminate benefits after it had previously found the claimant disabled under the same standard of disability. In this case, totally disabled is defined in the plan as "prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience." CIGNA found that Hairston's heart condition made him unable "to perform the essential duties of any occupation" in 1988. Hairston received benefits for eight years. When Hartford assumed administrative responsibility for the plan in 1995, Hartford assured Hairston that his "benefits would not be altered in any way." Hartford paid disability benefits to Hairston for another eight years. Hairston had therefore been receiving disability benefits for sixteen years under the "any occupation" definition of totally disabled before Hartford terminated his benefits. Furthermore, the plan states that after an insured becomes totally disabled Hartford will pay benefits until the insured is "no longer disabled" or fails to provide proof that she is continuously disabled. Thus, the cases cited by the defendants are not controlling, as this case did not involve an initial determination of whether Hairston was disabled or a new determination under a different definition of disability. Rather, the proper inquiry under the plan as to Hartford's termination of Hairston's benefits was whether Hairston was "no longer disabled" under the "any occupation" definition of totally disabled.

Hairston contends that the burden is on Hartford to show that his condition changed before it could terminate his benefits in December 2003. Hartford argues that an insurer need not show a changed medical condition before it can terminate disability benefits. While the Eighth Circuit has not explicitly required a change in the insured's condition before an insurer may terminate disability benefits, that court has held that a termination of disability benefits requires a significant change in

14

the information available to the insurer between the granting and the terminating of benefits. *See Morgan v. Unum Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001). In *Walke*, for instance, the insured's symptoms subsided after he quit work, but the court held that the improvement—which could be attributed to the elimination of job stress—was not a change of circumstances that warranted termination of benefits. 256 F.3d at 840. Similarly, the treating physician's opinion in *McOsker* that the insured "could return to work but not at [a] pre-disability level of functioning" did not justify the insurer's termination of benefits. *McOsker*, 279 F.3d at 589. There, the Eighth Circuit stated that it was "not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Id*.

According to its December 2, 2003, letter to Hairston, Hartford based its decision to terminate Hairston's benefits on Hairston's medical records and treatment notes for the period of January 27, 1986, through June 2, 2002; the independent record review by Dr. Peters; the employability analysis by vocational expert Marvin Bryan; and all the material in Hairston's file viewed as a whole. Nothing from this list, however, is significantly different from the evidence CIGNA considered in 1988 when it determined that Hairston was unable "to perform the essential duties of any occupation," or the evidence available to Hartford in 1995 when it became the insurer for the plan.

The medical records and treatment notes show that Hairston's condition in 2003 was substantially the same as it was in 1988. In 1988, Hairston's left ventricular ejection fraction was 33%. In 2001, it was 38%—still abnormally low. *See* Dorland's Illustrated Medical Dictionary 734 (30th ed. 2003) (normal ejection fraction is 65 ± 8 percent). Hairston's doctors have consistently diagnosed him with various forms of heart and artery disease from 1988 to 2003. Neither of Hartford's reviewing medical experts have challenged Hairston's diagnosis. In 1988, Dr. Hundley listed Hairston's cardiac functional capacity as class II. That classification has never changed. In 1988, Dr. Hundley stated that Hairston needed "to avoid any activity which puts extra demand on the heart muscle and results in fatigue." In 2002, the opinion of Hairston's doctors was still the same: Dr. Hill stated that Hairston "does have exertional angina but he limits his exertion."

Dr. Hundley rated Hairston's physical impairment as class four in 1988. Dr. Hill rated Hairston's physical impairment as a class three in 1991 and a class four in 1992. While Dr. Hill rated Hairston's physical impairment as a class two in 1996, he also wrote that Hairston's progress was "unchanged." Furthermore, Dr. Hill's physical capacity reports completed in 1993 and 1994 list substantially the same physical limitations for Hairston as the physical capacity report Dr. Hill completed in 2000; if anything, the 2000 limitations are more restrictive. Although in 2000 Dr. Hill checked "recovered" for Hairston's progress and stated that Hairston had reached the maximum medical improvement, he stated that Hairston could never return to work at his occupation and could not perform sedentary work.

The answers on Hairston's personal questionnaires did not vary significantly from 1987 to 2003. In 1987, Hairston stated that he got very tired and had to rest very often. In 1994, Hairston wrote, "condition unchanged from previous[:] chest pain [and] shortness of breath—overcome by

16

resting." In 1997, Hairston wrote that he enjoyed fishing and woodworking "on [an] occasional basis for short periods as long as I rest pretty regular." In 2000, Hairston stated that he could do most of his daily activities if they were accompanied by frequent rest periods. In 2001, Hairston stated that his rest periods became longer. In 2003, Hairston wrote, "unable to do any work without frequent rest[;] exertion causes chest pains and shortness of breath."

Finally, Hairston's physicians have consistently reported that he was unable "to perform the essential duties of any occupation." Dr. Hundley in 1987 wrote that Hairston was totally disabled from any occupation and would never be able to resume any work. Dr. Hill in January of 1992 stated that "patient remains disabled as previously noted in 1987." In 1993, Dr. Hill stated that Hairston would "probably never" be released to full-time work. In 2000, Dr. Hill wrote that Hairston could never return to his regular occupation and could not perform sedentary work. The only time in sixteen years that one of Hairston's treating physicians ever stated that Hairston was not totally disabled is recorded in Dr. Peters's recollection of his phone conversation with Dr. Hill. Dr. Peters wrote in his report that Dr. Hill told him Hairston was "probably capable of full time sedentary work." That recollection is highly suspect, however, as Dr. Peters's confirmation letter to Dr. Hill omits any reference to "full time," a crucial adjective where totally disabled is concerned. For this same reason, Marvin Bryant's employability analysis is of dubious value because it is based on the assumption that Hairston is capable of performing full-time sedentary work. However, even if Dr. Hill did opine that Hairston was "'probably' capable of full time sedentary work," such a qualified statement of mere possibility is insufficient support for Hartford's decision to terminate Hairston's benefits in light of the overwhelming evidence that nothing about Hairston's condition or

17

circumstances had significantly changed since 1988. *See McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003).

As the medical records and opinions of Hairston's treating physicians reflect no substantial change in Hairston's condition, Hartford's reliance on Dr. Peters's record review is misplaced. It is true that ERISA requires no special deference to treating physicians. *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004). And a plan administrator's decision generally cannot be said to have been arbitrary and capricious just because the administrator chose to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits. *McDonald*, 347 F.3d at 169. But where a reviewing physician's opinion lacks support in the record and cannot account for the contrary opinions of several treating physicians, the reviewing physician's opinion cannot form the basis for a plan administrator's decision. *Cf. McDonald*, 347 F.3d at 169-71 (reviewing physician's opinion was not substantial evidence where the opinion was contrary to treating physicians' opinions and both the claimant's diagnosis and his condition were unchanged from the time the plan administrator first granted benefits); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) (finding reliance on reviewing physician's opinion arbitrary and capricious when that opinion was contrary to the opinions of previous doctors and the reviewing physician provided no reasoning as to why his opinion was different from the previous opinions); *Morgan*, 346 F.3d at 1178 (reviewing physician's opinion was not substantial evidence where the opinion was contrary to opinions of two primary treating physicians, and record did not show reviewing physician had expertise or experience with disability at issue); *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996) (plan administrator abused its discretion in relying on reviewing physician's opinion that was contradicted by opinion

of one examining physician and two treating physicians), *abrogated in part by Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). Dr. Peters's medical review added nothing new. It was based on the same medical records that, as was discussed above, showed no substantial change in Hairston's condition from 1988 to 2003.

Furthermore, Dr. Peters framed the issues as whether "the available objective evidence support[s] the claim that he is unable to return to work at any level" and whether Hairston "retain[ed] the functional capacity to return to work." Such a framing of the issues would have been proper if Hartford was deciding whether Hairston was disabled in the first instance. However, the inquiry according to the plan language was whether Hairston was "no longer disabled," not whether he was disabled in the first place. Dr. Peters's opinions thus do not shed any light on the question of whether Hairston was "no longer disabled." His opinions are not substantial evidence supporting Hartford's termination of Hairston's benefits.

There is no substantial evidence that Hairston's condition in 1988 was any different than his condition in 2003. There is no substantial evidence that Hairston was "no longer disabled." Hartford's decision to terminate Hairston's benefits was therefore an abuse of discretion.

## CONCLUSION

For the reasons outlined above, Hairston's motion for summary judgment is GRANTED (Docket #8), while defendants' cross motion for summary judgment is DENIED. Docket #21. Hairston's motion for consideration for additional documents is DENIED. Docket #6. Hartford is ordered to reinstate Hairston's benefits and pay him back benefits plus interest from December 3, 2003.

IT IS SO ORDERED this   7th   day of March, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE